# In the United States Court of Federal Claims

Nos. 17-1765C and 17-1842C
(Filed Under Seal: December 1, 2017)
(Reissued for Publication: December 19, 2017)[*]

*************************************
| |
INTELLIGENT WAVES, LLC and           *
MISSION1ST GROUP, INC.,              *
                                     *
            Plaintiffs,              *     Post-Award Bid Protest; Motions for a
                                     *     Temporary Restraining Order and
v.                                   *     Preliminary Injunction; Likelihood of
                                     *     Success on the Merits; Organizational and
THE UNITED STATES,                   *     Consultant Conflict of Interest; Evaluation
                                     *     of Proposals; FAR 15.305(a); Irreparable
            Defendant,               *     Injury; Balance of Harms; Public Interest;
                                     *     National Defense; National Security;
and                                  *     Failure to Submit a Declaration or
                                     *     Affidavit Supplying Evidentiary Support
PROFESSIONAL SOLUTIONS1, LLC,        *
                                     *
            Defendant-Intervenor.    *
*************************************

Lee Dougherty, Washington, DC, and Christian B. Nagel, Tysons, VA, for plaintiffs.

Russel J. Upton, United States Department of Justice, Washington, DC, for defendant.

Katherine S. Nucci, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

In this bid protest, plaintiffs Intelligent Waves, LLC ("Intelligent Waves") and Mission1st Group, Inc. ("Mission1st") challenge the award of a five-year Indefinite Delivery Indefinite Quantity contract issued by the United States Defense Information Systems Agency ("DISA") to defendant-intervenor Professional Solutions1, LLC ("ProSol") for certain satellite communications support services. Specifically, Intelligent Waves alleges that the DISA

---

[*] The court issued this Opinion and Order under seal on December 1, 2017, and directed the parties to submit proposed redactions. This reissued Opinion and Order incorporates the redactions proposed by the parties, with some nonsubstantive typographical changes. All redactions are indicated by a bracketed ellipsis ("[. . .]").

improperly evaluated the proposals submitted by Intelligent Waves and ProSol, and Mission1st alleges that the DISA improperly evaluated the proposals submitted by Mission1st and ProSol. Currently before the court are Intelligent Waves's and Mission1st's motions for a temporary restraining order and a preliminary injunction enjoining DISA from lifting a stop-work order that is currently in place. Because neither protestor is likely to succeed on the merits of its claim, and both the balance of harms and the public interest weigh in favor of defendant, the court denies both motions.

## I. BACKGROUND

The Iridium constellation consists of sixty-six cross-linked satellites that operate "as a fully meshed network." Administrative R. ("AR") 346. The DISA's Enhanced Mobile Satellite Services ("EMSS") Program Office owns and manages an "EMSS-controlled satellite gateway that leverages the Iridium satellite constellation." Id. The EMSS Program Office provides "cradle to grave" satellite communications services, including the sale and provision of EMSS devices, a dedicated help desk, encrypted communications, and comprehensive operation and maintenance of the EMSS gateway. Id. at 346-47. One of the available services is the Distributed Tactical Communications System ("DTCS"). Id. at 347. The DTCS functions as a "push-to-talk" service that allows "one-to-many voice communication." Id. The DTCS is the "EMSS variant" of the Iridium commercial push-to-talk ("CPTT") service. Id. End users of the EMSS Program Office services include the United States Department of Defense ("DoD"), other federal agencies, state and local governments, Five Eyes nations, and other sponsored governments and entities.[1] Id. at 346.

The DISA reports to the DoD Chief Information Officer ("CIO"). Dep't of Def. Instruction 8420.02 (Sept. 15, 2016) at 10.[2] DoD components are required to procure mobile satellite services via procurements managed by the DISA. Id. at 23. Waivers are allowed through the DoD CIO when "EMSS cannot satisfy the user requirement." Id.

---

[1] The Five Eyes nations are Australia, Canada, New Zealand, the United Kingdom, and the United States. Ashley S. Deeks, A (Qualified) Defense of Secret Agreements, 49 Ariz. St. L.J. 713, 741 (2016). The Five Eyes agreement is a "long-standing secret intelligence agreement" that "allocates electronic surveillance collection among the five states and anticipates a high level of coordination and intelligence sharing." Id.

[2] Department of Defense Instruction 8420.02 is reproduced at Exhibit 1 of Intelligent Waves's complaint. See ECF No. 1-1.

A. **The Request for Proposals**

On December 2, 2016, the DISA issued Request for Proposals number HC1013-16-R-0014 (the "RFP").[3] AR 59. The RFP contemplated a single five-year contract for Global Logistical Services Management support ("ELOG") that would function as a follow-on effort to an existing contract, and was designated as a Service-Disabled Veteran-Owned Small Business ("SDVOSB") set aside.[4] Id. at 59, 341, 346-47, 4038. The Performance Work Statement ("PWS") was organized into eight task areas—Operational Support, Logistical and Procurement Support, Training Support, Program Management Support, Technical Support, Highly Qualified Expert/Subject Matter Expert Support, Operations Center Support, and Transition Support. Id. at 348. Offerors were required to submit their proposals in five volumes: Executive Summary, Technical/Management, Price, Past Performance, and Contract Documentation. Id. at 402. As part of the Contract Documentation volume, offerors were directed to include an Organizational and Consultant Conflict of Interest ("OCCI") Mitigation Plan or a statement that no OCCI was present. Id. at 408. The OCCI mitigation plan was to be "evaluated on an acceptable or non-acceptable basis," and an unacceptable plan could result in not being selected for award. Id. at 416.

The RFP provided that the contract would be awarded to the "responsible offeror whose proposal [was] determined to represent the overall best value to the Government using a best value tradeoff evaluation process." Id. at 409. Proposals were evaluated based on three factors—Technical/Management Approach, Past Performance, and Price. Id. The non-price factors were "significantly more important" than the price factor. Id. Technical/Management Approach, which was more important than Past Performance, was comprised of three subfactors of equal importance:

- Subfactor 1—Remote Mobile Telecommunications Services Management Expertise,

- Subfactor 2—Management Plan, and

- Subfactor 3—Sample Task Order.

Id. at 409-10. Technical/Management Approach was to be evaluated

---

[3] The RFP was subsequently amended six times. AR 344. The last amendment was issued on January 26, 2017. Id.

[4] The incumbent contractor is currently performing under a contract extension. See AR 1662.

using a combined technical/management rating and risk rating. Subfactor ratings **shall not be rolled up** into an overall color rating for the technical/management factor. The combined technical/risk rating includes consideration of risk in conjunction with the strengths, weaknesses, and deficiencies in determining technical ratings.

Id. at 409. The possible ratings were described as follows:

| Color | Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Purple | Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable. |

Id. at 414. The RFP also included relevant definitions:

- <u>Deficiency</u>—a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

- <u>Risk</u>—as it pertains to source selection, is the potential for unsuccessful contract performance.  The consideration of risk assesses the degree to which an offeror's proposed approach to achieving the technical factor or subfactor may involve the risk of disruption of schedule, increased cost or degradation of performance, the need for increased Government oversight, and the likelihood of unsuccessful contract performance.

- <u>Significant weakness</u>—a flaw that appreciably increases the risk of unsuccessful contract performance.

- <u>Strength</u>—an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance.

- <u>Uncertainty</u>—any aspect of a non-cost/price factor proposal for which the intent of the offeror is unclear (e.g., there is more than one way to interpret the proposal or inconsistencies in the proposal indicating there may have been an error, omission, or mistake).

<u>Id.</u> at 415.

Past Performance was evaluated as either acceptable or unacceptable:

| Rating | Description |
|---|---|
| Acceptable | Based on the offeror's performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort, or the offeror's performance record is unknown. |
| Unacceptable | Based on the offeror's performance record, the Government does not have a reasonable expectation that the offeror will be able to successfully perform the required effort. |

<u>Id.</u>

The RFP also incorporated by reference several Federal Acquisition Regulation ("FAR") clauses, id. at 416-22, including FAR 52.219-14, Limitations on Subcontracting, id. at 418. In addition, the RFP provided contact information for the DISA contracting officer. Id. at 139 (original RFP), 423 (final amendment). Intelligent Waves, Mission1st, and ProSol, as well as other potential offerors, submitted questions prior to the proposal deadline, some of which were submitted after the question posting deadline. See, e.g., id. at 162-68 (Intelligent Waves), 169 (Mission1st), 170-74 (ProSol), 490-92 (Mission1st), 503-05 (ProSol). Many of Intelligent Waves's questions focused on proposal formatting requirements. See generally id. at 164-68. Intelligent Waves also commented on the evaluation criteria for past performance, suggesting that (1) the DISA incorporate an offeror's "proven experience to perform work" in "austere environments" as contemplated by the RFP and (2) an "Acceptable" past performance rating for offerors with no past performance "puts the government and warfighter at risk for [un]successful performance on the awarded contract." Id. at 167. Mission1st sought more information regarding the relative importance of factors and subfactors, price information, and proposal formatting. Id. at 169, 490-92. ProSol asked questions regarding security clearances, compliance with United States Department of State regulations, and proposal formatting requirements. Id. at 170-74, 503-05. The DISA responded to 106 total questions that were submitted by the question posting deadline. Id. at 1664. See generally id. at 4666-701 (containing all 106 of the questions and answers).

### B. The Proposals

Intelligent Waves, Mission1st, ProSol, and three other offerors eventually submitted proposals. Id. at 1665, 4048.

In its proposal, Intelligent Waves described "Team IW" as being "comprised of [Intelligent Waves], prime offeror, and [. . .], significant subcontractor." Id. at 629. The Technical/Management volume of Intelligent Waves's proposal consistently referred to "Team IW." See, e.g., id. at 623 (containing a list of tables and drawings). Intelligent Waves represented that it "ha[d] entered into a binding written agreement with our significant team member [. . .]," and emphasized that [. . .] was "[. . .]." Id. at 648. Two out of the three prior contracts on which Intelligent Waves relied in the Past Performance volume of its proposal were [. . .] contracts, including the [. . .]. Id. at 680. Intelligent Waves reported "N/A" for its organizational structure change history, and noted that [. . .] was organized in 2006 and had not experienced any significant organizational changes since 2009. Id. at 700.

Intelligent Waves also included an OCCI mitigation plan as part of the Contract Documentation volume of its proposal. See generally id. at 761-65. Intelligent Waves stated that, "in order to avoid an apparent or perceived" OCCI, neither Intelligent Waves nor [. . .] would "provide systems engineering or technical direction[,] prepare specification or work statements and/or objectives for requirements[,] or[] provide evaluation services or obtain access to propriety information in the execution of the EMSS ELOG contract." Id. at 761. Intelligent Waves acknowledged that [. . .] has "conducted historical sales of Iridium commercial devices, namely [CPTT] devices and ancillary items," and therefore neither Intelligent Waves nor [. . .] would "pursue the sale or operational support of any current or future Iridium [CPTT] devices to

new customers who are eligible for Iridium airtime services under the Government's 'Iridium Flat-Fee Airtime' (IFFA) contract . . . and the contract awarded from this solicitation . . . unless expressly approved by the EMSS waiver process." Id. Since [. . .] planned to continue to provide support to its existing Iridium customers, such as the United States Army Central Command, [. . .] promised to segregate employees supporting its Iridium customers from those working on the EMSS ELOG contract. Id. at 762.

In the Technical/Management volume of its proposal, Mission1st provided a management plan touting its [. . .]. Id. at 525. See generally id. at 533-40 (containing Mission1st's management plan). Mission1st reported that [. . .] provided a subcontractor management plan. Id. at 535. In its staffing plan, Mission1st averred that it had a thirteen-year history of "successfully recruit[ing] and retain[ing] hundreds of personnel on DoD contracts at locations worldwide," including [. . .] currently operating throughout the Middle East who have satellite communications experience and technical certifications. Id. at 535-36. Mission1st also highlighted its "proven ability to quickly grow and shrink [its] staff in response to changing work conditions." Id. at 538.

In discussing its past performance, Mission1st indicated that it has supported "hundreds of projects for DoD software and systems," and noted that it was then the prime contractor for various communications and infrastructure support, information technology services, and professional engineering services contracts. Id. at 577. According to Mission1st, the three contracts listed in the Past Performance volume of its proposal "cover[ed] every aspect of the EMSS ELOG PWS." Id.; see also id. ([. . .]).

In its proposal, ProSol declared that it has "fifteen years of technical and recent operational experience supporting warfighters around the world" in addition to its Top Secret facility clearance that makes it "capable of independently executing every aspect of the EMSS/ELOG program requirements." Id. at 877. ProSol emphasized its "partnership with Marshall Communications Corporation [("Marshall")]," which ProSol described as a "best-in-class" DISA field service representative provider with "Remote Mobile Telecommunications Services Management" experience fulfilling "nearly the exact requirements as the ELOG Program." Id. ProSol noted that Marshall is a Veteran-Owned Small Business. Id. In the Technical/Management Approach volume of its proposal, ProSol described its experience working with the DISA to provide logistics, operations and maintenance, warranty, help desk, technical support, and training services in the Middle East and elsewhere. Id. at 887. With respect to its organizational structure, ProSol explained that ProSol and Marshall would "execute a comparable amount of work," with the exception that ProSol would exclusively perform program management functions, because ProSol and Marshall was a "well-balanced team" with respect to technical knowledge and experience. Id. at 896. ProSol noted, however, that it would perform a majority of the "direct labor activities" itself, consistent with the set aside. Id.; see also id. at 3790 ("As a SDVOSB and in compliance with FAR part 52.219-14, ProSol will perform at least 51% of the Labor on this contract.").

ProSol listed three contracts in the Past Performance volume of its proposal: (1) a $15.6 million contract between ProSol and the United States Marine Corps for communications, systems, and technology support, id. at 955; (2) a $43.3 million contract between Marshall and the United States Navy to provide operational, logistical and procurement, technical, and subject matter support to the DISA in the Middle East and elsewhere, id. at 958; and (3) $2 million in subcontracts between ProSol and the United States Department of Homeland Security to provide logistics, help desk, project management, training, communications, and subject matter expert services, id. at 963.

### C. Discussions

After all of the proposals were submitted, the results of initial evaluations were as follows:

|  | **Intelligent Waves** | **Mission1st** | **ProSol** |
| --- | --- | --- | --- |
| **Technical/Management Approach** | | | |
| Subfactor 1 | Marginal | Unacceptable | Outstanding |
| Subfactor 2 | Marginal | Good | Outstanding |
| Subfactor 3 | Acceptable | Acceptable | Outstanding |
| **Past Performance** | | | |
|  | Acceptable | Acceptable | Acceptable |
| **Price** | | | |
|  | [. . .] | [. . .] | $32,953,522 |

Id. at 1670. The contracting officer recommended holding discussions and keeping all six offerors in the competitive range because each offeror had a "reasonable chance of being selected for award following discussions." Id. at 1669. Upon approval of the Source Selection Authority, evaluation notices ("ENs") were issued as follows:

- Intelligent Waves—five ENs (two technical in nature, one regarding OCCI, and two with respect to price);

- Mission1st—six ENs (four technical and two price); and

- ProSol—one EN (technical).

Id. at 1673.

Two rounds of discussions were held. The first round of ENs was transmitted on June 16, 2017. Id. at 1677 (Intelligent Waves), 1739 (Mission1st), 1756 (ProSol). The second round of ENs was transmitted on August 16, 2017. Id. at 2499 (Intelligent Waves), 2533 (Mission1st), 2542 (ProSol).

During the first round of discussions, the contracting officer sent an EN to Intelligent Waves in which he observed that [. . .], Intelligent Waves's major subcontractor, "sells and supports substantial commercial Iridium products and airtime, especially in the Middle East, and those products and services essentially compete with the EMSS Program," and that Intelligent Waves "did not demonstrate knowledge of mobile systems and devices . . . outside of [its] partnership with [. . .]." Id. at 1680. He noted that [. . .]'s status as a seller of Iridium products "increase[d] the risk of non-objective expertise and support being provided" on the EMSS ELOG contract. Id. at 1681. He then explained that the proposed firewall among [. . .] employees was insufficient because "the impaired objectivity pertains [to] [. . .] as an organization," not to individual groups of employees. Id. at 1683; see also id. at 1689-93 (discussing the insufficiency of Intelligent Waves's OCCI mitigation plan). The contracting officer noted that [. . .] was not an Iridium reseller [. . .]. Id.

Intelligent Waves submitted an updated OCCI mitigation plan in response to this EN. Id. at 2141. However, the contracting officer remained concerned that the updated OCCI mitigation plan failed to adequately address the concern regarding [. . .]'s "impaired objectivity." Id. at 2506, 2517-18. Specifically, as reflected in a subsequent EN sent to Intelligent Waves, the contracting officer remarked that part of the updated mitigation plan involved utilizing only Intelligent Waves direct employees to perform certain PWS activities, which was problematic for the DISA because those activities "are integrated into larger task order requirements . . . and cannot reasonably be segregated without imposing a substantial burden on the government that elevates the risk of unsuccessful performance." Id. at 2507. Further, the contracting officer noted that the determination of Intelligent Waves that commercial Iridium CPTT services did not compete with EMSS DTCS services ran contrary to the DISA's view. Id. at 2510. He also stated that Intelligent Waves failed to address how [. . .]'s legacy customers would be dealt with. Id. at 2510, 2517. Ultimately, the contracting officer advised that it was "unacceptable to the Government" for a contractor to [. . .]. Id. at 2518. Intelligent Waves responded to this EN with another updated OCCI mitigation plan. Id. at 2805-06.

### D. Evaluation of Proposals

After the second round of discussions, the revised proposals were evaluated. During its evaluation, the evaluation team determined that Intelligent Waves did not resolve any of its non-price ENs, id. at 4154, 4161, and that Mission1st resolved all of its non-price ENs, id. at 4150-52. The final evaluations were as follows:

|  | **Intelligent Waves** | **Mission1st** | **ProSol** |
|---|---|---|---|
| **Technical/Management Approach** ||||
| Subfactor 1 | Marginal | Acceptable | Outstanding |
| Subfactor 2 | Marginal | Good | Outstanding |
| Subfactor 3 | Acceptable | Acceptable | Outstanding |
| **Past Performance** ||||
|  | Acceptable | Acceptable | Acceptable |
| **Price** ||||
|  | [. . .] | [. . .] | $30,295,442 |

Id. at 4128-29, 4203.

The evaluation team assigned the following strengths and weaknesses with respect to the Technical/Management Approach factor:

|  | **Intelligent Waves** | **Mission1st** | **ProSol** |
|---|---|---|---|
| **Technical/Management Approach** ||||
| Subfactor 1 | [. . .] | [. . .] | 7 strengths<br>0 weaknesses |
| Subfactor 2 | [. . .] | [. . .] | 8 strengths<br>0 weaknesses |
| Subfactor 3 | [. . .] | [. . .] | 1 strength<br>0 weaknesses |

Id. at 4134-40 (ProSol), 4149-53 (Mission1st), 4153-63 (Intelligent Waves).  With respect to the Past Performance factor the evaluation team noted that all three of ProSol's past performance references returned questionnaires, and each of ProSol's three prior contracts were deemed recent, relevant, and to have an acceptable quality of performance.  Id. at 4169-74.  Intelligent Waves also had all three past performance contracts rated as recent, relevant, and having an acceptable quality of performance.  Id. at 4195.  Mission1st similarly had all three past performance contracts rated as recent and relevant, but only one was deemed to have an acceptable quality of performance (with the remaining two unknown).  Id. at 4189-90.

Ultimately, the evaluation team recommended that ProSol be awarded the contract.  Id. at 4122, 4203.  Specifically, in comparing ProSol's and Mission1st's proposals, the evaluation team determined that ProSol's approach under subfactor 1 had "numerous technical advantages over that of [Mission1st]," id. at 4211; that ProSol's "proposed organizational structure [was] superior to [Mission1st's]" under subfactor 2, id. at 4212; and that ProSol's sample task order under subfactor 3 "contained advantages" over Mission1st, id. at 4213.  The evaluation team further found that there was "no advantage to either proposal under the past performance factor," but ProSol's "numerous strengths that benefit the Government in various ways that [Mission1st's] proposal is lacking" and concomitant lower risk of unsuccessful performance outweighed Mission1st's slight price advantage.  Id. at 4214.

Then, in comparing the proposals of ProSol and Intelligent Waves, the evaluation team determined that "[t]he relative merits of ProSol's proposed approach to subfactor 1 [were] technically superior to the relative merits of [Intelligent Waves's] proposed approach," id. at 4219; that "ProSol's proposed organization structure and proposed cost management plan [were] superior to those of [Intelligent Waves] with strengths in [ProSol's] approach for recruiting and retaining personnel, . . . subcontract management, organizational structure methodology, and . . . flexibility and performance" under subfactor 2, id. at 4220; and that ProSol's sample task order under subfactor 3 was "exceptional" and thus "superior" to the adequate sample task order submitted by Intelligent Waves, id. The evaluation team referred to [. . .]'s involvement as "present[ing] a risk of impaired objectivity in [Intelligent Waves's] performance of the contract," but noted that "[e]ven if these weaknesses related to . . . utilizing [. . .] as a subcontractor were completely mitigated, ProSol's technical advantages . . . outweigh[ed Intelligent Waves's] price advantage." Id. at 4221.

### E. The Source Selection Decision and Contract Award

After reviewing the evaluation team's report, the Source Selection Authority determined that ProSol's proposal "offer[ed] the best value" to the DISA. Id. at 4413; accord id. at 4501. The Source Selection Authority observed that ProSol's approach was "free of weaknesses and deficiencies," "contain[ed] sixteen strengths and no weaknesses," and was "technically superior to all other offerors." Id. at 4501. Therefore, the Source Selection Authority explained, ProSol's "technical superiority" outweighed the lower prices proposed by Intelligent Waves and Mission1st. Id. Because ProSol's price was "balanced, complete, and fair and reasonable" and ProSol "met all administrative requirements of the RFP," the contracting officer was directed to award the ELOG contract to ProSol. Id.

The ELOG contract was officially awarded to ProSol on October 20, 2017. Id. at 4299. Both Intelligent Waves and Mission1st had been notified, three days prior to the official award, of their non-selection and that ProSol was determined to represent the overall best value. Id. at 4090 (Intelligent Waves), 4101 (Mission1st). Both Intelligent Waves and Mission1st received written debriefings on October 20, 2017. See generally id. at 4286-90 (Intelligent Waves), 4295-97 (Mission1st). The contracting officer answered follow-up questions submitted by Mission1st on October 24, 2017. See id. at 4515-16.

### F. Procedural History

Mission1st filed a protest at the Government Accountability Office ("GAO") on October 25, 2017. See generally id. at 4521-29. Mission1st argued that the DISA improperly evaluated ProSol's proposal because (1) ProSol did not have the expertise to meet the requirements for subfactor 1 of the Technical/Management Approach factor, (2) Mission1st should have received an "Outstanding" rating for subfactor 2, (3) ProSol does not have sufficient experience to warrant an "Acceptable" past performance rating and thus Mission1st should have been rated "at least equivalent" to ProSol with respect to its overall technical capability, and (4) ProSol would be unable to adhere to the limitation on subcontracting clause contained in the RFP. Id. at 4524-28. Pursuant to FAR 52.233-3, a stop-work order was issued on October 30, 2017. Id. at 4558.

ProSol filed a motion for summary dismissal of the protest on November 13, 2017. Id. at 4577-80. The DISA then filed a motion to dismiss the protest on November 15, 2017, id. at 4621, arguing generally that Mission1st's protest grounds were "untimely, speculative, and fail[ed] to state a valid basis of protest," id. at 4623.

In the meantime, on November 9, 2017, Intelligent Waves filed the instant protest in this court, arguing generally that the DISA improperly evaluated Intelligent Waves's and ProSol's proposals, and further arguing that the DISA's determination regarding the insufficiency of Intelligent Waves's OCCI mitigation plan was arbitrary and capricious because it followed a plan [. . .]. Compl. ¶¶ 3-4. Intelligent Waves explained that (1) ProSol's "lack of demonstrated 'expertise'" precluded ProSol from receiving an "Outstanding" rating under subfactor 1 of the Technical/Management Approach factor, id. ¶ 69, (2) Intelligent Waves "itself" had the requisite experience to perform under subfactor 1 and thus its assessment of a weakness was improper, id. ¶¶ 73, 77, and (3) ProSol lacked the requisite experience to receive an "Outstanding" rating under subfactor 2, id. ¶ 84.

On November 16, 2017, the DISA requested that the GAO dismiss Mission1st's protest pursuant to 4 C.F.R. § 21.11(b) because the protest concerned the same procurement as the instant bid protest. AR 4706. Mission1st opposed DISA's dismissal, id. at 4741-42, while ProSol agreed that the GAO protest should be dismissed, id. at 4743. The GAO issued a dismissal order on November 21, 2017, explaining that the GAO would not entertain protests "where the matter involved is the subject of litigation before a court of competent jurisdiction . . . [e]ven where the specific issues before the court are not the same as those raised [at the GAO] . . . if there is a reasonable possibility that the court's disposition of the matter [would] render a decision by [the GAO] academic," and that the Intelligent Waves complaint in this court called into question ProSol's expertise and capabilities and the reasonableness of the DISA's evaluation. Id. at 4746-47.

On November 28, 2017, Mission1st filed its complaint in this court, asserting the same claims that it presented to the GAO. That case was transferred to the undersigned and consolidated with this case on November 29, 2017. Because the DISA indicated that it would lift its stop-work order on December 1, 2017, see Def.'s Opp'n to Pls.' Mots. for Emergency Injunctive Relief ("Def.'s Opp'n") Attach. 3, ECF 29-1, Intelligent Waves and Mission1st filed motions for a temporary restraining order and a preliminary injunction. Defendant responded on November 30, 2017, and the court heard oral argument on December 1, 2017.

## II.  STANDARD OF REVIEW

The United States Court of Federal Claims ("Court of Federal Claims") possesses "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2012), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2). In bid protests, the Court of Federal Claims reviews the challenged agency action pursuant to the standards set forth in 5

U.S.C. § 706. Id. § 1491(b)(4). Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004); accord Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016). The "arbitrary and capricious" standard is "highly deferential" and requires courts to sustain agency actions that demonstrate "rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000). In other words, reviewing courts conduct a "rational basis" review of the agency action at issue, rather than an "independent de novo assessment." Turner Constr. Co., Inc. v. United States, 645 F.3d 1377, 1384-85 (Fed. Cir. 2011) (internal quotation marks omitted).

Rule 65 of the Rules of the United States Court of Federal Claims guides the court in awarding preliminary injunctive relief. Preliminary injunctive relief is "an extraordinary and drastic remedy." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (internal quotation marks omitted); accord FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); Akal Sec., Inc. v. United States, 87 Fed. Cl. 311, 316 (2009). A protestor "seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); accord Amidon, Inc. v. United States, 124 Fed. Cl. 517, 522 (2015). None of the four factors, taken individually, is dispositive, and a "weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp., 3 F.3d at 427. Conversely, "the absence of . . . any one factor may be sufficient" to deny preliminary injunctive relief. Id.; see also Wind Tower Trade Coal. v. United States, 741 F.3d 89, 100 (Fed. Cir. 2014) ("[A] showing on one preliminary injunction factor does not warrant injunctive relief in light of a weak showing on other factors."); Atlanta Pharma AG v. Teva Pharm. USA, Inc., 566 F.3d 999, 1005 (Fed. Cir. 2009) ("[A] movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction."). The award of preliminary injunctive relief is within the discretion of the court. FMC Corp., 3 F.3d at 427. "When injunctive relief is warranted, it will only be issued upon a showing by a preponderance of the admissible evidence." Textron, Inc. v. United States, 74 Fed. Cl. 277, 287 (2006).

### III. ANALYSIS

As an initial matter, the court finds that it has jurisdiction over the instant protests because both Intelligent Waves and Mission1st have made nonfrivolous allegations that the DISA improperly evaluated proposals. See Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1345 n.1 (2008) ("A non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction."). Further, both Intelligent Waves and Mission1st have standing as "interested parties" because each submitted a proposal and was determined to be in the competitive range. See CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1575 (Fed. Cir. 1983) (finding that a protestor "within the 'zone of active consideration'" had "standing to challenge the proposed award").

## A. Likelihood of Success on the Merits

To prevail on their motions for a preliminary injunction, either Intelligent Waves or Mission1st must establish that it is likely to succeed on the merits of its protest. Under the applicable standard of review, the court

> may set aside a procurement action if (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. A court reviews a challenge brought on the first ground to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations and internal quotation marks omitted).

If the court finds that "the government acted without rational basis or contrary to law when evaluating bids and awarding the contract," it must then "determine, as a factual matter, whether the bid protester was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). A bid protester demonstrates prejudice by "show[ing] that there was a 'substantial chance' it would have received the contract award" absent the error found by the court. Id. at 1353; see also Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 695-97 (2010) (distinguishing "allegational prejudice" required to establish standing from the "prejudicial error" required to prevail on the merits).

The court finds that neither Intelligent Waves nor Mission1st is likely to succeed on the merits of their protests.

The gravamen of Intelligent Waves's protest is that the DISA's determination that [. . .]'s Iridium sales presented an OCCI weakness was "arbitrary, capricious, and lack[ed] a rational basis." Intelligent Waves Mem. Supp. Mot. TRO & Mot. Prelim. Inj. ("Intelligent Waves Mem.") 20, ECF No. 24. A conflict of interest arises when a contractor "will evaluate its own offers for products or services, or those of a competitor, without proper safeguards to ensure objectivity to protect the Government's interests." FAR 9.505-3. At oral argument, counsel for Intelligent Waves stressed that there is no competition between Iridium CPTT and EMSS DTCS because the DoD CIO, who oversees the DISA, has the authority to grant waivers allowing DoD agencies to procure Iridium CPTT services, and, in any event, the DoD components are not in competition with one another because they fall under the same umbrella.

Intelligent Waves's argument concerning OCCI is unavailing. First, the DoD as a whole is not considered one agency. DoD departments are the separate military departments (Army, Navy, and Air Force—the Marine Corps is part of the Navy), and the various "defense agencies" include the DISA, the Defense Intelligence Agency, the National Geospatial-Intelligence Agency, the National Security Agency, the United States Special Operations Command, the Defense Logistics Agency, and others. See Defense Federal Acquisition Regulation Supplement 202.101. Thus, various components of the DoD are considered separate agencies. Second, it is well within the DISA's discretion to determine that Iridium CPTT and EMSS DTCS are competing services. This determination is logical because both services "offer similar capability . . . to the same customer markets," AR 4435, and the DISA is free to prefer one over the other, as it has consistently done. Third, that [. . .] is currently [. . .] is of no moment with respect to the OCCI issue because (1) [. . .] did not become an Iridium reseller until after it [. . .] and (2) the DISA is free to institute new requirements in new procurements. Fourth, Intelligent Waves received multiple ENs regarding its OCCI weakness and failed to adequately address the DISA's concerns. The DISA explained its rationale at length in the ENs, in the technical evaluation, in the source selection document, and in the debriefing. Simply put, Intelligent Waves cannot overcome its "heavy burden," Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001), of demonstrating that the DISA's determination lacked a rational basis.

Finally, even if the DISA erred in finding that [. . .]'s participation gave rise to an OCCI and thus one or more weaknesses, there is no prejudicial error because the DISA found that ProSol's proposal was technically superior to Intelligent Waves's proposal notwithstanding the various issues concerning [. . .] and the OCCI. The OCCI only concerned subfactors 1 and 2. Even if Intelligent Waves had also received fifteen total strengths across those two subfactors (like ProSol) instead of [. . .], ProSol was still rated "Outstanding" for subfactor 3, compared to Intelligent Waves's "Acceptable" rating, based on the sample task orders.

Intelligent Waves also contends that the DISA "failed to adhere to the evaluation requirements stated in the [RFP] when it found that ProSol warranted an outstanding rating under Subfactor 1." Intelligent Waves Mem. 27. It is axiomatic that proposals must be evaluated in a manner that is "reasonable and consistent with the evaluation criteria and applicable statutes and regulations," and that the "merit of competing proposals is primarily a matter of agency discretion." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (internal quotation marks omitted); accord FAR 15.305(a) (providing that government agencies must "evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation"). Intelligent Waves provides no support for its argument that the DISA did not follow the evaluation criteria set forth in the RFP beyond its averment that ProSol's experience was "insufficient to demonstrate 'expertise' in providing support in remote, hostile locations." Intelligent Waves Mem. 29. Intelligent Waves appears to argue that ProSol cannot rely on the experience of its subcontractor partner to meet the experience requirement, which runs counter to Intelligent Waves's assertions that the experience of its own subcontractor partner is relevant to capability determinations. Intelligent Waves cannot have it both ways. "After all, in the law, what is sauce for the goose is normally sauce for the gander." Heffernan v. City of Paterson, 136 S. Ct. 1412, 1418 (2016). Regardless, the DISA provided detailed

explanations of the relevant experience that ProSol brings to the table. Further, even if ProSol had been rated lower than "Outstanding" for subfactor 1 of the Technical/Management Approach factor, it was rated "Outstanding" in the remaining technical subfactors with myriad strengths. Thus, if the OCCI-related issues discussed above were set aside and Intelligent Waves received "Outstanding" ratings for subfactors 1 and 2, ProSol still would have been rated technically superior.[5]

Mission1st similarly avers that the DISA improperly assigned ProSol an "Outstanding" rating in subfactor 1 because "ProSol has no experience performing computer facilities management services on federal contracts of significant size and extremely limited experience in the geographic region or battlefield environment(s) as required by the [RFP]." Mission1st Mem. Supp. Mot. Injunctive Relief ("Mission1st Mem.") 9, ECF No. 26. Mission1st's argument concerning ProSol's subfactor 1 rating fails for the same reason that Intelligent Waves's argument regarding subfactor 1 failed—the DISA sufficiently explained the relevant experience that ProSol brings to the table, with or without its subcontractor partner.

Mission1st also posits that it should have received an "Outstanding" rating for subfactor 2, rather than a "Good" rating, because it was assessed [. . .] that were described as "outstanding," see AR 4295-96, and [. . .]. Mission1st's reasoning reflects an improper application of the stated evaluation criteria. A "Good" rating was assigned to subfactors with strengths that "outweigh[ed]" any weaknesses, while an "Outstanding" rating was assigned when strengths "far outweigh[ed]" any weaknesses. In other words, Mission1st's [. . .] in subfactor 2 did not necessarily compel an "Outstanding" rating for that subfactor, as outstanding as those individual strengths may have been. Therefore, the DISA did not improperly rate Mission1st's proposal as "Good" for subfactor 2. But even if Mission1st had been assigned an "Outstanding" rating, ProSol's "Outstanding" rating—with eight strengths compared to [. . .]—likely would have carried more weight in the DISA's overall best value determination. Thus, if ProSol had received a lower rating for subfactor 1, and Mission1st had received a higher rating for subfactor 2, it would not have been unreasonable for the DISA to determine that ProSol provided a technically superior proposal.

With respect to past performance, Mission1st asserts that ProSol was undeserving of its "Acceptable" rating. Mission1st invokes FAR 15.305(a)(2)(iv), which states that "an offeror without a record of relevant past performance or for whom information on past performance is not available . . . may not be evaluated favorably or unfavorably." Mission1st avows that the lack of a neutral past performance rating, in contravention to the FAR, "improperly allowed the [DISA] to assign a favorable rating to offerors with no past performance." Mission1st Mem. 12. Mission1st's argument here fails for two reasons. First, Mission1st did not raise this argument in a pre-award protest. Contractors who have the opportunity to object to the terms of a solicitation, but fail to do so, are precluded from later raising such objections in a bid protest. Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007); see also Per Aarsleff A/S, 829 F.3d at 1313. Second, even if there should have been a neutral rating available

---

[5] Intelligent Waves contends only that it "would have received either Good or Acceptable ratings under [subfactors 1 and 2]." Intelligent Waves Mem. 27.

for past performance, it likely would not have changed the results. ProSol provided three past performance references, all of which were deemed recent, relevant, and of acceptable quality. It was therefore reasonable for ProSol to have been given an "Acceptable" rating on the Past Performance factor.

Mission1st's final assignment of error relates to the limitations on subcontracting. FAR 52.219-14(c)(1) provides that "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." While Mission1st correctly states the law, it fails to recognize that ProSol's proposal does not violate the limitations on subcontracting. ProSol demonstrated that it is acutely aware of the limitations on subcontracting, and proposed to perform a majority of the contract work.

In sum, neither Intelligent Waves nor Mission1st is likely to succeed in demonstrating that the DISA's decision to award the EMSS ELOG contract to ProSol was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Nevertheless, for the sake of completeness, the court addresses the remaining factors for establishing the need for injunctive relief: irreparable injury, the balance of harms, and the public interest.

### B. Irreparable Injury

With respect to irreparable injury, a protestor "must show that without a preliminary injunction it will suffer irreparable harm before a decision can be rendered on the merits." Akal Sec., 87 Fed. Cl. at 311; accord IBM Corp. v. United States, 118 Fed. Cl. 677, 683-84 (2014). Intelligent Waves avers, through its counsel (without a supporting affidavit or declaration), that it will lose the opportunity to compete for the EMSS ELOG contract, expected profits from performing the contract, and "the experience in performing this complex, global contract that [Intelligent Waves] could apply toward its future proposals for other government work," if it does not receive injunctive relief because it "cannot recover these financial and experiential losses" without such relief. Intelligent Waves Mem. 30. Mission1st also avers, through its counsel (without a supporting affidavit or declaration), that it will "suffer irreparable harm if an injunction is not granted, because the only other available relief—the potential for recovery of bid preparation costs—will not compensate Mission1st for the loss of valuable business on the Solicitation." Mission1st Mem. 17. Neither Intelligent Waves nor Mission1st has provided the court with the evidence necessary to carry its burden. See Gemtron Corp. v. Saint-Gobain Corp., 572 F.3d. 1371, 1380 (Fed. Cir. 2009) (observing that "unsworn attorney argument . . . is not evidence").

For the sake of argument, however, the court will proceed with its analysis as if Intelligent Waves and Mission1st had submitted evidentiary support for their claims. The Court of Federal Claims has recognized that a lost opportunity to compete for a contract—and the attendant inability to obtain the profits expected from the contract—can constitute an irreparable injury. See, e.g., Akal Sec., 87 Fed. Cl. at 819; Heritage of Am., LLC v. United States, 77 Fed. Cl. 66, 78 (2007); Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000).

Absent preliminary injunctive relief, the stop-work order will be lifted on December 1, 2017, and both Intelligent Waves and Mission1st will likely have permanently lost the opportunity to perform under the contract. No adequate remedy exists to make up for this potential loss of business or competitive advantage; were they to be awarded, bid preparation and protest costs would be wholly insufficient. Accordingly, both Intelligent Waves and Mission1st will likely be irreparably injured absent injunctive relief.

### C. Balance of Harms

In addition to considering whether a protestor would suffer an irreparable injury absent injunctive relief, "[t]he court must balance the harm plaintiff would suffer without preliminary relief against the harm that preliminary relief would inflict on defendant and defendant-intervenor. Generally, if the balance tips in favor of defendant, a preliminary injunction is not appropriate." Akal Sec., 87 Fed. Cl. at 320 (citation omitted); accord Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715 (2006). The court has already presumed, for argument's sake, that Intelligent Waves and Mission1st will likely suffer an irreparable injury in the absence of preliminary injunctive relief. Intelligent Waves contends that the "DISA can maintain the services needed through a brief extension to [. . .] during the pendency of this protest." Intelligent Waves Mem. 30-31. Mission1st similarly argues that the DISA can "easily extend its current contract with [. . .]." Mission1st Mem. 18. Meanwhile, defendant explains that issuing a temporary restraining order or a preliminary injunction would [. . .]. Def.'s Opp'n 32, ECF No. 29. Under a bridge contract, [. . .] would be [. . .]. Id. at 32-33. Indeed, unlike Intelligent Waves and Mission1st, defendant attached a declaration from the supervisory program manager for the DISA on the incumbent contract detailing the harm that the government would suffer if injunctive relief were to issue. Id. at 32.

On one hand, the court assumes (for sake of argument) that the protestors will likely suffer irreparable harm absent such relief. On the other hand, the harm to the government—as supported by declaration—would not be insubstantial, as Intelligent Waves and Mission1st proclaim. Because the protestors are unlikely to succeed on the merits, the balance of harms weighs in defendant's favor.

### D. Public Interest

Finally, when "employing the extraordinary remedy of injunction," a court "should pay particular regard for the public consequences" of doing so. Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). It is undisputed that "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." Overstreet, 47 Fed. Cl. at 744; accord Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 242 (2010) (noting the "overriding public interest in preserving the integrity of the procurement process"). However, there is also a "public interest in minimizing disruption [to the agency]." Heritage of Am., 77 Fed. Cl. at 78, quoted in Akal Sec., 87 Fed. Cl. at 321; accord Aero Corp., S.A. v. United States, 38 Fed. Cl. 237, 242 (1997) ("[A] procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion.").

Both Intelligent Waves and Mission1st highlight the public interest in fair procurements. In addition, Mission1st suggests that the public interest is served by "reducing any risk to the ultimate consumers of the Contract services [due to] ProSol's inexperience" because "[t]hese communications systems constitute a vital lifeline required both for mission accomplishment of national security objectives, for the safety of their users and to disseminate critical real-time intelligence to battlefield commanders and operators in conflict zones." Mission1st Mem. 19. Intelligent Waves remarks, in discussing the balance of hardships, that any "national defense and security concerns in this case are limited" because of the DISA's ability to extend the contract. Intelligent Waves Mem. 30-31. Defendant highlights the public interest in avoiding undue interference with procurements, and agrees with Mission1st that the procurement "implicates national defense and national security interests." Def.'s Opp'n 34 (relying on Mission1st Mem. 19). Defendant specifies that both the incumbent contract and the contract at issue in this protest involve "mission critical operations support for Special Forces and others performing critical military functions." Id. at 35.

The court agrees with Mission1st and defendant that there is a significant public interest in ensuring the safety of people and property. This interest is endangered when the federal government lacks confidence that its contractor can provide the necessary support. The DISA has reasonably placed its confidence in ProSol, and is understandably reticent to award a sole-source bridge contract to a contractor that was not selected for the follow-on effort and competes with the services at issue here. Accordingly, the public interest weighs in defendant's favor.

## IV. CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed herein, they are unpersuasive, without merit, or are unnecessary for resolving the matters currently before the court.

Neither Intelligent Waves nor Mission1st are likely to succeed on the merits of their protests. Although both protestors may be irreparably harmed absent an injunction, the balance of harms and the public interest weigh in favor of the defendant.

Therefore, the court **DENIES** Intelligent Waves's motion for a temporary restraining order and a preliminary injunction and **DENIES** Mission1st's motion for a temporary restraining order and a preliminary injunction. The parties shall, consistent with the court's November 27, 2017 scheduling order, file a joint status report suggesting a schedule for further proceedings **no later than Monday, December 11, 2017**.

[. . .]

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge